· GEORGE DUDLEY vs. HORACE C. DEMING AND ANOTHER.

Where, in an action of replevin for property attached as the property of E, brought by G, the claim was that G had bought the property of E before the attachment, but it appeared that the contract was made by a third person and the bill of sale taken in the name of G without his previous authority or assent or ratification before the suit was instituted and without any consideration moving from him, or any delivery to him of the property or bill of sale, or the communication to him of any knowledge of the transaction prior to the bringing of the action of replevin, or any proof of a subsequent ratification or acceptance, held that no title passed by the bill of sale.

The Supreme Court of Errors was constituted as a court for the correction of errors of law only.

It was not the intention of the legislature when they passed the act of 1864, which provides that the Superior Court, in actions at law tried without a jury, shall, on motion of either party, make a finding of the facts, which shall become a part of the record, to change the jurisdiction of the Supreme Court and authorize or require it to take cognizance of questions of fact.

REPLEVIN for two horses attached by the defendants as the property of one Everett E. Dudley, brought to the superior court in Hartford county, and tried on a plea denying the title of the plaintiff, the issue being closed to the court, before *Carpenter, J.* The following facts were found by the court.

The plaintiff bought, in the year 1837, for the benefit of his parents, a farm in Bloomfield, which he still owns. At the time of the purchase his parents, and shortly after his brother Everett Dudley, went to live there. In consideration of the use of the farm and the products therefrom Everett was to take care of his father and mother. The father lived there until his death in 1865. The mother and Everett have resided since 1837 and still reside upon the farm. At the time of the purchase the plaintiff also bought oxen and other stock and placed them upon the farm, and they remained the property of the plaintiff. Everett has, since 1837, managed the farm and taken care of his parents. No charge for rent or for the use of the stock has ever been made against him

by the plaintiff, and neither has kept any account with the other in regard to the farm, its rent or its products.  Everett has sold that portion of the crops raised upon the farm which he chose to sell, without accounting therefor to the plaintiff, and has bought whatever personal property he chose to buy without authority therefor from the plaintiff.  Since the purchase of the farm the stock has been changed frequently by sales and new purchases by him.  Several years ago the oxen then upon the farm were sold by him, and a pair of horses purchased in their place.  No evidence was offered to show that the horses were purchased with the money realized from the sale of the oxen.  Since then the horses have been sold or traded by him, and new horses obtained by purchase or exchange have been sold or traded a number of times.  No authority has ever been given by the plaintiff to Everett to trade or buy cattle, horses, or other property as his agent. All the personal property on the farm, including stock and products, has been managed exclusively by the latter as he would manage his own property, without any interference on the part of the plaintiff.  The plaintiff and Everett have always claimed as between themselves that the stock upon the farm, either the increase of the stock originally placed there, or such as had been bought in lieu thereof, was the property of the plaintiff.

In August, 1863, Edward E. Dudley, a minor son of Everett Dudley, becoming of age on the 25th of April, 1864, went into the stage business between Tariffville and Hartford, in company with one McAuliffe.  In September, 1863, Edward purchased McAuliffe's interest in the business, and gave him therefor his negotiable note for $500 to the order of Everett, which was endorsed for the accommodation of Edward by Everett and one Thomas Gabb, payable in one year from date.  Edward thereafter owned four horses which were used in the stage business.  They were kept at the barn on the farm in Bloomfield when not in use upon the stage.  He lived with his father continuously, except for about nine months when in the army, from childhood till July, 1864, and worked for his father when not in the army or in the stage busi-

ness till the last date, not receiving wages, or being charged for his board or clothing, but was taken care of and provided for by his father as minor children usually are. During the time that he was in the stage business, meal, hay and straw were furnished him. from the farm for his horses. Everett made no charge on book, and kept no account of the articles so furnished, nor of the sum of $95 which was paid by him in Hartford for meal furnished Edward. The value of the articles so furnished and the money so paid are now estimated by Everett to have been about $500.

On March 1st, 1864, Edward sold out the stage business and establishment to one Porter White, except two horses which were left in the barn upon the farm. On the same day he sold the two horses, a pair of harnesses and a sleigh to his father, in consideration of the liability of the latter upon the note endorsed by him, of meal, hay &c. furnished, and of cash paid, and took therefor the following receipt:—" Received of E. E. Dudley four hundred dollars in full of all demands to date. Everett Dudley." At the same time Edward gave, by direction of Everett, a bill of sale of the horses, harnesses and sleighs to George Dudley, the plaintiff, in order to vest the title in him. No bill of sale was ever given or taken to the plaintiff of any personal property bought or sold by Everett except in this instance. The horses were the only horses upon the farm on the 1st of March, 1864, and until the attachment to be mentioned. The horses remained in the same barn, and were thereafter used on the farm in the farm business until the attachment. There was no other delivery to the purchaser and no other change of possession. No notice of the bill of sale or of the purchase was given by Everett to the plaintiff until after the issuing of the writ of replevin. After the attachment and before the issuing of the replevin writ, Everett wrote to the plaintiff, " Your horses have been attached." Edward remained at home and worked on the farm for and with his father, and occasionally used the horses in the farm work.

On June 4th, 1864, Deming & Barwick attached the two horses in a pasture upon the farm, as the property of Edward

E. Dudley, in a suit in their favor against him, upon an account for meal bought of them by him while in the stage business, and on June 13th, 1864, the horses were replevied by the plaintiff by the present suit.

In September, 1864, Everett paid McAuliffe the $500 note from the avails of a tobacco crop on the farm. In the summer of 1865 one of the replevied horses died, and the neighbors of Everett raised money by subscription and purchased and presented him another horse. The subscription paper, setting forth the fact of the death of a horse belonging to Everett Dudley, and the purpose for which the money was solicited, was sent by mail to the plaintiff, and he subscribed thereon the sum of thirty dollars. The defendants obtained judgment in their suit against Edward E. Dudley for $62.25 damages, and $24.10 costs, which judgment is still in force and unpaid. The value of the horses replevied was $200.

The defendants claimed that the facts so proved showed such property in the horses in Edward E. Dudley as rendered them liable to attachment at their suit as his creditors, and that they did not show such title in the plaintiff as would enable him to maintain this action. The court so decided, and found the issue for the defendants; and the plaintiff moved for a new trial.

*Chamberlin* and *Barbour*, in support of the motion.

*Sill,* contra.

BUTLER, J. This is an action of replevin for two horses. The issue is made by a plea in bar, which is substantially a denial of the plaintiff's title. Whether or not the plaintiff had title, is the only question legitimately upon the record. Whether or not the horses were so the property of Edward Dudley that they could be attached and holden by his creditors, and all the facts in that connection, are immaterial except as they bear upon the one legitimate question, whether the plaintiff had title or not.

Edward Dudley at one time owned the horses, and, prior

to the attachment, there was a transaction between Edward Dudley and Everett Dudley respecting the horses, during which a bill of sale of them was executed to the plaintiff. But we think it very clear upon the facts found that no title was intended to be passed, and that none in fact passed to the plaintiff.

No agreement was made by the plaintiff with Edward Dudley,—no consideration passed from the plaintiff,—the bill of sale was never delivered to him,—the horses were not delivered to him,—and he had no knowledge of the transaction until after this suit was instituted,—nor does it appear that he ever claimed the horses, or that he claims them now.

It is obvious that no title could pass in such a transaction, from Edward Dudley to the plaintiff, unless Everett Dudley was the *agent* of the plaintiff, and had full authority to bind the plaintiff in the transaction. And that fact it is incumbent upon the plaintiff under such circumstances to show by *clear evidence*.

The facts found show no such agency. In respect to the stock of cattle originally placed upon the farm, and their increase, perhaps an authority to exchange or supply may be inferred from the fact that the plaintiff furnished a stock of cattle originally; and the finding that the stock and its increase or substitution was considered by the plaintiff and Everett as the property of the plaintiff. But the facts found disclose no authority express or implied, to purchase and trade *horses* as the agent of the plaintiff. The term stock, as used in the finding, uniformly imports cattle and not horses, and such is its popular meaning when used in respect to a farm.

It is very clear then, not only that the finding does not show a previous authority from the plaintiff to Everett to purchase these horses on his account, or any subsequent ratification of the transaction; but it is expressly found that no authority was ever given by the plaintiff to Everett to trade or buy cattle, horses or other property as the agent of the plaintiff. It is therefore a naked case where a party purchasing property procures the bill of sale to be taken in the

name of· a third person, without the previous or subsequent assent, authority or knowledge of such person, or any delivery of the bill of sale or, property to him, actual or constructive. Under such circumstances no title passes to the person named in the bill of sale, and no action can be maintained in his name ; and the experiment made in this case must fail.

But if· this were not so we should feel constrained to dismiss the case without disturbing the judgment.

The question presented to us for decision is simply a question of fact, to wit, whether the facts found, or in other words the indisputable evidence, proved the primary fact in the case, to wit, whether the plaintiff had title or not. It is substantially a question whether the court found the main fact. correctly in view of the evidence. And it is obvious that if such a practice is authorized, and is to be continued, the findings on the main questions of fact determined by the superior court, upon which the particular case turned, may be reviewed before this court by motion in error or a motion for a new trial in all cases.

It was the intention of the framers of the constitution that the Supreme Court of Errors should be a court for the correction of errors *in law*. The language used clearly imports this, and such has ever been the understanding of the legislature, of the courts, and of the people of the state. When the court was constituted by the General Assembly under the constitution, immediately after its adoption, its jurisdiction was confined to "all matters brought by way of error or complaint from the judgments or decrees of any superior court, in matters of law or equity, wherein the *rules of law or principles of equity* appear from the files, records or exhibits of said court, to have been mistakenly or erroneously adjudged and determined." This statute has remained unchanged and in force from that time to the present, and has been and is the fundamental authority upon which we act. Our duty then is to consider and determine matters wherein the rules of law or principles of equity have been mistakenly or erroneously adjudged and determined. All matters of fact then, if wrongfully determined, are excluded from our jurisdiction,

and such has been the construction put upon this statute by this court in numerous cases.

By an act passed in 1864 it was provided that "whenever an action at law shall be tried by the superior court without a jury, said court shall find, upon the motion of either party, the facts upon which the judgment is founded, and cause such finding to become a part of the record." Did the legislature intend by that act that the evidence, if indisputable or found to be true, should be spread upon the record, so that upon motion for a new trial or on motion in error this court should review the determination of the superior court upon the question whether the evidence did or did not prove the main facts involved in the issue? We think not, and that such a finding of facts, although a part of the record, cannot be legitimately used in any other manner than facts recited in a bill of exceptions or a motion for a new trial,—that is to say, for the purpose of presenting for the consideration of this court, and for its action, some question of law involved and decided. We adopt this view of the intention of the legislature, not only because any other view would be inconsistent with the provisions of the statute under which the court is constituted, the obvious intent of the constitution, and the uniform decisions of the court, but because any other view is opposed to all the analogies of our system. For, in the first place, provision exists in that system for a review of the action of the court where the judgment is against the weight of evidence; and in the second place there is no analogous proceeding in our system. In chancery proceedings the statute requires the facts to be found by the court, and upon motion in error it is a legitimate question for this court whether or not the facts, upon principles of equity, entitle the party to the relief decreed or denied. But that furnishes no analogy for this proceeding, for in equity the petitioner is bound to spread his whole case, and all the facts upon which he relies to sustain it, upon the face of his bill, and he is confined upon the trial to the facts thus set forth, and the court is restrained to their consideration alone. The facts being necessarily set forth in the petition, the respondent may demur to them, and by so

doing suppose them to be true, and test the question whether they are sufficient to entitle him to relief if true, and the petitioner has an equivalent right, when the facts are found and spread upon the record, by a motion in error to review the question of their sufficiency upon principles of equity, if his petition is denied and his bill dismissed. But such proceedings in equity furnish no analogy for a proceeding like this. It is sometimes the practice for auditors to report the facts or the evidence which they find to be indisputably true, and to refer to the court some question of law, finding the issue contingently upon the determination of the question of law. It would be strange indeed if auditors could be permitted to report the evidence in actions of law, and leave the principal facts to be determined by the court.

In view of these considerations we are of opinion that it was not the intention of the legislature, when they passed the act of 1864, that questions of fact should be presented for our consideration, or that we should take jurisdiction of them. And it must be understood that cases involving questions of fact will not hereafter be considered.

A new trial is not advised.

In this opinion the other judges concurred, except CARPENTER, J., who having tried the case in the court below did not sit.