AUGUSTUS COOK *vs.* CHARLES A. WEED AND ANOTHER.

This court cannot find facts, or infer the existence of other facts from facts which are found, but is confined to the questions of law which arise on the record. Therefore, where an auditor found certain facts in detail, and upon those

Cook *v.* Weed.

facts found that the defendant was indebted to the plaintiff, it was held, that this court could not review any question of fact which arose on the trial before the auditor, and that whether the auditor reasoned soundly or unsoundly from the evidence, in coming to the conclusion that the defendant was indebted, was not for this court to determine.

ASSUMPSIT for money had and received, to recover the avails of one hundred and seven bales of cotton; brought to the Superior Court in New Haven county, and referred to an auditor, who found the following facts :

The firm of C. A. Weed & Co. consisted, during the period of the transactions hereinafter stated, of Charles A. Weed and John H. McKee. McCombie & Child were during the same period commission merchants, doing business in the city of New York. George P. Floyd was during the month of June, 1865, the agent of C. A. Weed & Co. for the purchase of cotton in and about the vicinity of Montgomery, in the state of Alabama. The plaintiff in the month of February, 1864, while residing in Montgomery, purchased one hundred and forty-eight bales of cotton. He left Montgomery and came to New York in April, 1864, having stored ninety-eight bales of the cotton in an old house two or three miles from Montgomery, and fifty bales in a cellar in Montgomery. In the spring of 1865 the plaintiff sent an agent, R. Cook, to Alabama to look after this cotton or its avails. R. Cook, upon his arrival at Montgomery, on the 9th of June, 1865, found that one hundred and seven bales of this cotton had been, on the 3d of June, 1865, shipped by George P. Floyd on board the steamer Waverly, (a boat chartered by C. A. Weed & Co.,) the cotton being consigned to J. L. Reese & Co., of Mobile, for account of C. A. Weed & Co.

On the 11th of June, 1865, and while R. Cook was at Montgomery, the defendant, Charles A. Weed, arrived at that place from Mobile, and with his knowledge and consent George P. Floyd gave to R. Cook the following order :

"Montgomery, June 11th, 1865.

C. A. Weed & Co.

Please deliver to R. Cook the proceeds of one hundred and seven bales of cotton, shipped by me from Montgomery, Ala.,

on steamer Waverly, June 3d, 1865, consigned to C. A. Weed & Co., marked G. P. F., and No. from 1 to 98, [G. P. F.], (9 bales), less the expenses, charges, &c.                 C.

Respectfully,

GEO. P. FLOYD.

The above one hundred and seven bales of cotton were placed in my charge by A. Cook, to be shipped as my cotton. I now transfer the same to R. Cook, as per order of A. Cook, per Jane A. Cook.

GEO. P. FLOYD."

The cargo of the Waverly consisted in all of five hundred and ninety-one bales, all consigned to J. L. Reese & Co., for account of C. A. Weed & Co., and all owned by C. A. Weed & Co., with the exception of the one hundred and seven bales mentioned in the foregoing order.

The Waverly arrived in Mobile about the 8th of June, 1865, and under the then existing rules and regulations of the treasury department her cargo was taken possession of by the agents of the United States government, and went into the government warehouse. By these rules and regulations cotton of the character of that on board the Waverly was to be received by the agents of the government, and three-quarters only thereof of an average grade with the whole to be returned to the owner, the remaining one-quarter being retained by the government. On the 13th of June, 1865, these rules and regulations were abrogated by the proclamation of the President of the United States, but there was no evidence when intelligence of that fact reached the city of Mobile, and only four hundred and thirty-five bales out of the five hundred and ninety-one bales of the Waverly's cargo were delivered by the government agent to C. A. Weed & Co.

On the 17th of June, 1865, three hundred and ninety-one bales of this cotton, (in which lot the plaintiff's cotton was included), were shipped by C. A. Weed & Co. to their consignees, McCombie & Child, in New York. On the 16th of June, 1865, C. A. Weed & Co. gave to R. Cook the following certificate :

"Mobile, June 16th, 1865.

This is to certify that we have shipped to Messrs. McCombie & Child, New York, for account of R. Cook, one hundred and seven bales cotton, marked as follows:

98 bales, numbered from 1 to 98, marked G. P. F.
9    "        "        "        "    [G. P. F.]
                                                   C.

The expenses on the above cotton are to be deducted from the proceeds when sold.

C. A. WEED & Co."

And on the 19th of June, 1865, they addressed a letter to McCombie & Child, advising them of the shipment of the three hundred and ninety-one bales, and directing them to sell to the best advantage on their account; they also by the same letter advised the consignees that one hundred and seven bales of this cotton belonged to R. Cook, and instructed them to sell those bales separately if possible, or if the marks upon the cotton were so obliterated as to render separation impossible, to let R. Cook have one hundred and seven bales promiscuously, and in either event to deduct from the gross amount of sales twenty-five per cent, and to place the amount so deducted to the credit of C. A. Weed & Co.

The cotton arrived in New York about the 28th day of June, 1865, and was there taken possession of by the agents of the government, who imposed upon it a tax of one cent per pound for shipping charge, and two cents per pound revenue tax; both these charges were illegal, as the regulations above mentioned expressly exempted the cotton upon which they had operated from any further imposition of tax. But both charges were paid by McCombie & Child under protest, and being paid they received the cotton into their possession. The shipping charge was subsequently refunded by the government to McCombie & Child, and by them credited on account. The revenue tax never has been refunded.

The marks upon the cotton were so obliterated that no separation of the one hundred and seven bales could be made; and McCombie & Child, after selling the whole three hundred

and ninety-one bales, credited R. Cook with $\frac{167}{391}$ parts of the net proceeds.    They included in their charge against R. Cook twenty-five per cent. on the gross amount of sales of that proportion, with which sum they credited C. A. Weed & Co. They also credited C. A. Weed & Co. with the remaining $\frac{284}{391}$ parts of the net proceeds of sales of the three hundred and ninety-one bales, and afterwards paid them the full amount so credited.

McCombie & Child made advances and payments to R. Cook on account of the proportion of the net proceeds credited to him, to such an extent that if the proportion thus credited to him was correct, there was, on the 25th day of October, 1865, due to the plaintiff from McCombie & Child the sum of one hundred and eleven dollars.

Upon the foregoing facts, which for the sake of distinction the auditor termed primary facts, the auditor found the defendants not indebted to the plaintiff, provided and assuming that $\frac{167}{391}$ parts of the gross sales of the entire lot of the three hundred and ninety-one bales correctly represented the amount for which the plaintiff's one hundred and seven bales sold.

The auditor further found, by an analysis of a schedule of the respective weights of ninety-eight of the one hundred and seven bales, referred to as Exhibit 6, and a schedule of the weights and prices of the whole three hundred and ninety-one bales, that the sum of forty-two and one-half cents was the probable average price for which the ninety-eight bales of cotton described in Exhibit 6 were sold ; and that twenty pounds per bale was the probable average excess in weight of said ninety-eight bales, over the average weight of the entire lot of three hundred and ninety-one bales ; and as to the remaining nine bales of the plaintiff's cotton, that there was no means of approximating the amount for which he should have been credited, more nearly than under the rule adopted by McCombie & Child for that purpose.

The table of weights of the ninety-eight bales was given by Floyd to R. Cook at Montgomery. There was no evidence that said paper had or had not been shown to the defendants, or to

their house in Mobile, or to McCombie & Child in New York, or whether any information of its contents had been given to them before the bringing of this suit.

Upon the foregoing facts, which the auditor termed secondary facts, the auditor found, if the law would justify the finding upon these facts, that on the 25th day of October, 1865, the defendant, Charles A. Weed, was indebted to the plaintiff in the sum of four hundred and ninety-two dollars and five cents, being the difference between the price per pound credited to R. Cook by McCombie & Child, and the price per pound at which said ninety-eight bales were sold, and in the further sum of eight hundred and thirty-three dollars, being the difference between the quantity of cotton as contained in said ninety-eight bales, with which R. Cook was credited by McCombie & Child, and the actual quantity contained in said ninety-eight bales, said two sums amounting together to the sum of thirteen hundred and twenty-five dollars and twenty-five cents.

The defendant, Charles A. Weed, remonstrated against the acceptance of the report of the auditor. The Superior Court, (*Sanford, J.*) overruled the remonstrance, accepted the report, and rendered judgment for the plaintiff. The defendant thereupon filed a motion in error assigning the following errors:

The court erred in accepting the report of the auditor, because by the record it appears,

1. That as matter of law the defendant was not responsible for any weights given in Exhibit 6, for the reason that such weights were not made known to the defendant.

That as matter of law the defendant cannot be charged with the knowledge of the contents of Exhibit 6, upon the facts found by the auditor.

That as matter of law, therefore, the auitor erred in charging the defendant with any liability as found in the secondary facts, so far as the same are ascertained by a comparison of the table of weights marked Exhibit 6.

2. That by the facts found by the auditor, and designated primary facts, the plaintiff was estopped from claiming

any other basis of settlement than that adopted by McCombie & Child, and that in view of such facts the auditor erred in establishing a liability based upon secondary facts, so called.

3. That as matter of law the auditor erred in giving any effect to Floyd's statements or declarations, except as the agent of C. A. Weed & Co. to purchase cotton.

4. That as matter of law the auditor erred in submitting to the court the facts designated as secondary facts, for its opinion as to the legal effect thereof, no distinct question of law being presented thereby.

5. That as matter of law the facts designated secondary facts are not within the issues between the parties, and will not sustain a judgment thereon.

6. That as matter of law the auditor erred in finding any secondary facts whatever.

7. That as matter of law the defendant is entitled to judgment upon the primary facts as found, and the secondary facts will not sustain a judgment by themselves alone.

*C. G. Child*, for the plaintiff in error.

1. " If it appears from the face of the proceedings, or upon inquiry of them in court, that a committee has made out its award upon such inferences from facts as the law will not warrant, or has clearly mistook with regard to the admission of evidence, its award may be set aside." Second case of *Parker* v. *Avery*, Kirby, 353. The court in *Leavenworth* v. *Marshall*, 19 Conn., 411, 417, examined facts on a motion in error, after remonstrance in the Superior Court, to determine if an inference from facts was properly drawn, and, notwithstanding the phraseology of the c hief justice in *Goodman* v. *Jones*, 26 Conn., 267, the same course was followed, viz., an examination into the facts appearing on the record, to ascertain if the law justified the conclusion. The case at bar differs from *Ashmead* v. *Colby*, 26 Conn., 289, for in this case the auditor leaves the question of law to the court, in that case no such question was raised; neither do we here object to the weight of evidence, or to its legitimate effect, or that the auditor mistook its legal effect, or seek to review any facts

found upon matters directly within the issue, but we claim a clear mistake, under the rule in *Parker* v. *Avery*, and hence error. In a question of constructive fraud the court would examine the facts to ascertain if as matter of law fraud exists. *Brainerd* v. *Arnold*, 27 Conn., 626. In this case the auditor himself presents a special class of facts, with a query as to their legal effect. We ask, and have a right to ask, the court to determine this legal question.

2. By the primary facts as found, Geo. P. Floyd was an agent to purchase cotton, and for no other purpose. He did not purchase Cook's cotton for C. A. Weed & Co., but after having shipped the cotton to C. A. Weed & Co's consignees at Mobile, gave, in his own name, an order on C. A. Weed & Co. to pay the proceeds of cotton which he states in such order to have been shipped as his own. In this transaction C. A. Weed & Co. became Floyd's consignees and forwarders, not his principals. C. A. Weed & Co. received all of the proceeds of the shipment to their own use, except the avails of Cook's cotton; for the latter they accounted with Cook, by Floyd's order, having recognized him throughout as a principal as to these one hundred and seven bales, and they themselves as his agents. Exhibit 6 was given by Floyd to Cook ; there is no proof that the defendant knew of its existence, but it is conceded Cook did. If not known to C. A. Weed & Co., there was nothing in the case to charge knowledge of its contents upon them. There was nothing in Floyd's connection with them to make C. A. Weed & Co. responsible for the knowledge of the weights of the one hundred and seven bales, for the transaction was without the scope of Floyd's employment.

3. The only use to which Exhibit 6 is put by the auditor, is for an approximated identification of the ninety-eight bales specified therein, in order to determine the *probable* average price, and the *probable* average weight. But the auditor does not hold us responsible for the nine bales which are not mentioned in Exhibit 6 : they cannot be identified, and we are not required to find their *probable* weight, or *probable* price. Why then should we be required to identify bales

not received by us, and be held responsible upon an average made up of weights and prices in no way appertaining to the plaintiff's cotton? If only one bale in Exhibit 6 is perfectly identified, are we to be responsible for ninety-seven bales on an approximation, when the government had taken one hundred and fifty-six bales from our shipment before Cook's cotton came into our possession, and there is no evidence but every bale referred to in Exhibit 6 was taken? Certainly there is no room for probable weights and prices from approximate identification after these bales were taken, whatever there might have been before.

· 4.    Even if Floyd had been our agent, the cotton was in possession of the government June 8th, the day before R. Cook could possibly have seen Exhibit 6, he not arriving at Montgomery, till the 9th, and not receiving his order till the 11th. When the government received the cotton to select average grade and quality, we had not in any way knowledge of Exhibit 6, and from that time forth it is impossible to identify the cotton. Taking further into consideration that quality and condition, not dead weight, command prices for cotton, we claim to the court: (1.) That there are no secondary facts, (even if there can be such facts,) whatever in the case, and the auditor erred in finding any. (2.) That it is not in issue between the parties to determine a probable result from an incomplete analysis, but that if the defendants discharged their duty in the ordinary custom of merchants, they have satisfied any cause of action the plaintiff may have against them. The primary facts establish no such cause of action. (3.) That no judgment being sustainable by the secondary facts, they should not be made the ground of liability. If C. A. Weed & Co. had not owned the balance of the Linda's shipment, but forwarded for others, and sold as they did for Cook, would Exhibit 6 have given Cook the rights found as secondary facts against his co-shippers? (4.) The possession of Exhibit 6 by Cook from the middle of June until the 25th day of October, during which interval the entire shipment was disposed of and advances made, he not communicating to McCombie & Child its contents, estops him from availing

himself of it to change the defendant's liability. Because possessing the means of identification, he, (if the auditor's theory is correct,) allows us to proceed on a mistaken hypothesis, found to be the best under the circumstances, and then seeks advantage from our mistake. *Taylor* v. *Ely*, 25 Conn., 258 ; *Roe* v. *Jerome*, 18 id., 153. The defendants knew nothing of Exhibit 6 ; Cook did ; how can they be charged with a knowledge of its contents, because Floyd, outside of his employment to purchase cotton, shipped to C. A. Weed & Co. as consignees ? If the defendants are liable for Floyd's acts, it is only within the agency entrusted to him, for all other acts of Floyd they stood in the relation of buyers, obligated to pay the prices contracted for at Montgomery. To Cook they sustained the relation of commission merchants, under obligations to forward his cotton to New York, there sell the same and account for the proceeds, after deducting charges as commission merchants. Floyd however received from Cook his cotton, as his own, shipped it for Cook to Mobile as his own, and gave an order upon C. A. Weed & Co., without which they would not have been justified in delivering the cotton to Cook. In the whole transaction he acts for and in behalf of Cook, not at all in behalf of the defendants ; he rendered them no service, and could have claimed no compensation, but for Cook he rendered service and authorized expense. It was the defendant's duty to ship at once Cook's cotton to market. The balance of the Waverley's cargo they might have held or disposed of at their option, and yet Floyd purchased their entire shipment.

The primary facts find an entire discharge of duty on C. A. Weed & Co's. part ; the secondary assume a liability based on weights, no where else recognized, and at variance with the manner in which the shipment and sale were conducted, to arrive at a *probable result*, connected with the primary facts only by inference.

*H. B. Harrison*, for the defendant in error.

PARK, J. We discover no question of law arising on the

record in this case.   It does not appear that the auditor ex-
cluded any evidence offered by the defendants, or admitted
any evidence to which they objected. · It does not appear that
any question of law was ruled against the defendants, either
by the auditor on the trial, or by the Superior Court upon the
remonstrance.   The assignment of errors has reference only
to questions of fact that arose on the trial before the auditor,
which this court cannot review.   Indeed the only question
before the auditor was whether the defendants had fully paid
the plaintiff for certain cotton that the plaintiff had sold to
the defendants, and if not, what amount remained unpaid.
The auditor sets forth in detail the facts of the case in his
report, and in order to present the case in the clearest light,
he divides the facts into two classes; one class he denominates
primary facts, and the other class secondary facts.   But both
classes contain nothing but facts. The auditor finds that from
the evidence which proved the secondary facts, he was satis-
fied that the defendants were indebted to the plaintiff in a
certain sum, and finds for the plaintiff to recover that amount.
We think the evidence tending to show the secondary facts
was proper evidence to be considered by the auditor upon the
question of indebtedness, and indeed no objection was made
to its admissibility on the trial.   Whether the auditor rea-
soned soundly, or unsoundly, from the evidence, in coming to
the conclusion that the defendants were indebted, is not for
this court to determine.   This court is a court of law.   We
cannot find facts, or infer the existence of other facts from
the facts which are found, but must confine ourselves to the
questions of law which arise on the record.   ·*Dudley* v. *Dem-
ing*, 34 Conn., 169; *Murphy* v. *N. York & N. Haven R. R.
Co.*, 29 id., 496; *Callender* v. *Colegrove*, 17 id., 1; *Corbin*
v. *The American Mills*, 27 id., 274; *Bloodgood* v. *Beecher*,
35 id., 469.

There is no error in the judgment complained of.

In this opinion the other judges concurred.